TIMOTHY DURLEY,

      Plaintiff,

  v.            Case No. 21-cv-154-pp

NURSE JENNIFER KACYON,[1]

      Defendant.

**ORDER DENYING AS UNNECESSARY DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 71), DENYING PLAINTIFF'S MOTION FOR SANCTIONS (DKT. NO. 63), GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 49) AND DISMISSING CASE**

Plaintiff Timothy Durley, who is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against a nurse at Waupun Correctional Institution. The defendant has moved for summary judgment. Dkt. No. 49. The plaintiff filed a document titled "motion for summary judgment in opposition to Defendant motion for summary judgment," dkt. no. 64, and he has moved for sanctions against the defendant, dkt. no. 63. The defendant has moved to strike the plaintiff's "motion for summary judgment." Dkt. No. 71. The court addresses the plaintiff's "motion" for summary judgment and denies as unnecessary the defendant's motion to

---

[1] When the complaint was docketed, it incorrectly spelled the defendant's last name "Karyon." The court since has amended the docket to reflect the correct spelling—"Kacyon."

Case 2:21-cv-00154-PP   Filed 12/29/23   Page 1 of 52   Document 83

strike it, denies the plaintiff's motion for sanctions, grants the defendant's motion for summary judgment and dismisses this case.

## I.     Facts

### A.     Procedural Background

On February 8, 2021, the court received the plaintiff's complaint, which alleged that nurse Jennifer Kacyon failed to provide him medical treatment for breathing difficulties he suffered from asthma. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim against Nurse Kacyon in her individual capacity. Dkt. No. 11 at 6–8. The court denied the plaintiff's motion to consolidate this case with another case the plaintiff recently had filed (Case No. 21-cv-153) because the complaints asserted claims about events that occurred on different days and involved different nurses. Id. at 8–10.

On July 25, 2022, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 15. On September 8, 2022, the defendant moved for summary judgment on the ground that the plaintiff had not exhausted his administrative remedies before bringing the lawsuit. Dkt. No. 18. The court granted the defendant's motion to stay discovery and dispositive motion deadlines pending the court's ruling on her motion for summary judgment on exhaustion grounds. Dkt. No. 23. On October 29, 2022, after the parties fully briefed the defendant's motion, the court denied it. Dkt. No. 32.

On November 1, 2022, the court issued an amended scheduling order setting new deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 33. On February 27, 2023, the court received the plaintiff's motion requesting an extension of the deadlines because of what he called "a harmless error on a request" for the prison to preserve camera footage. Dkt. No. 38. The court granted the plaintiff's motion and extended the parties' deadlines. Dkt. No. 39.

On March 29, 2023, the court received the plaintiff's expedited motion for a court order directing Waupun officials to preserve video footage. Dkt. No. 42. On April 17, 2023 the court received the defendant's motion to again extend the dispositive motion deadline and to extend her time to respond to the plaintiff's motion about the video footage. Dkt. No. 43. The court granted that motion, again stayed the deadline for the parties to file dispositive motions and extended the defendant's deadline to respond to the plaintiff's motion about the video footage. Dkt. No. 44. The defendant filed her response to the plaintiff's motion on May 19, 2023. Dkt. No. 45. But on May 30, 2023, the plaintiff filed a request asking the court to consider his motion moot because the prison had informed him that the video footage no longer was available. Dkt. No. 47. The court granted the plaintiff's request, denied as moot his motion to compel production of the video footage and ordered the parties to file dispositive motions by July 17, 2023. Dkt. No. 48.

At the July 17, 2023 deadline, the court received the defendant's motion for summary judgment and her supporting materials. Dkt. Nos. 49–54. The

next day, the court ordered the plaintiff to file his response to the defendant's motion by the end of the day on August 16, 2023. Dkt. No. 55. On August 4, 2023, the court received the plaintiff's motions for an extension of time to file his response materials and to file a response brief in excess of the court's thirty-page limit. Dkt. Nos. 57, 58. On August 14, 2023, the court granted the plaintiff's motion for an extension of time and extended his response deadline to October 31, 2023. Dkt. No. 59. The court denied the plaintiff's motion to file a brief in excess of thirty pages. Id.

Even though the court gave the plaintiff until October 31, 2023 to file his response materials, the court received those materials on September 18, 2023. Dkt. Nos. 60–62, 65. The same day, the court received the plaintiff's motion for sanctions, dkt. no. 63, and his "motion for summary judgment in opposition to Defendant motion for summary judgment," dkt. no. 64. On October 2, 2023, the defendant filed her reply brief in support of her motion for summary judgment and a response to the plaintiff's additional proposed findings of fact. Dkt. Nos. 67, 68. A week later, on October 9, 2023, the defendant requested an extension of time to respond to the plaintiff's motion for sanctions. Dkt. No. 69. The court granted her request and extended her time to respond to the plaintiff's motion until October 19, 2023. Dkt. No. 70. On October 18, 2023, the court received the defendant's motion to strike the plaintiff's "motion for summary judgment" (Dkt. No. 64). Dkt. No. 71. The next day, the court received the defendant's response to the plaintiff's motion for sanctions. Dkt. No. 72. The parties since have completed briefing on the defendant's motion for

4

summary judgment, the plaintiff's motion for sanctions, the plaintiff's "motion for summary judgment" and the defendant's motion to strike the plaintiff's "motion for summary judgment."

On November 20, 2023, the court received the plaintiff's motion to return documents he said he had mailed to the court. Dkt. No. 80. On November 29, 2023, the court denied the motion, explaining that the court "will not order the clerk to send free copies of documents to the plaintiff" and that he must pay for copies of any documents he requests from the court. Dkt. No. 81.

B.     Motion to Strike (Dkt. No. 71)

As noted, the parties' final deadline to file dispositive motions was July 17, 2023. Dkt. No. 48. On September 18, 2023, more than two months past that deadline, the court received from the plaintiff a "motion for summary judgment in opposition to Defendant motion for summary judgment." Dkt. No. 64. The motion asks the court to deny the defendant's motion for summary judgment because "there is a genuine issue of a material fact that needs to be resolved." Id. at 1. The motion discusses "the summary judgment standard" and recounts the documents that each party filed regarding the defendant's motion for summary judgment. Id. at 1–2. The motion reiterates, "this court should deny the Defendant [*sic*] motion for summary judgment for there is a genuine issue of a material fact[] at issue." Id. at 2.

The defendant has moved to strike the plaintiff's "motion" because it "is untimely by over two months." Dkt. No. 71. The defendant acknowledges, "It is possible that the purpose of this motion was to serve as another brief in

opposition to defendant's motion for summary judgment." Id. at 1. But the defendant says that "that is unclear," and points out that the plaintiff "refers to disputed and undisputed facts." Id.

The plaintiff responds that the court should deny the defendant's motion because it does not "state no statute nor rule pursuant to which it is made," which he says violates Civil Local Rule 7(a). Dkt. No. 73 at 1. The plaintiff accuses the defendant of "trying to stall from answering [his] motion for sanctions." Id. Finally, he notes that he "always put[s] 'Plaintiff motion for summary judgment in opposition to Defendant motion for summ[a]ry judgment' because [he is] filing [his] dispositive motion in opposition to the defendant." Id. at 1–2. The plaintiff emphasizes that he did not "file no extra motion, nor brief in this case on 9-19-23." Id. at 2. The defendant did not file a reply brief in support of her motion to strike.

The plaintiff's "motion" for summary judgment is not a motion—it is a response to the defendant's motion (Dkt. No. 49), as the defendant herself suspected. The plaintiff did not file any documents in support of a potential motion for summary judgment, such as a declaration or exhibits. He filed his "motion" the same day that he filed his response to the defendant's brief and proposed findings of fact, his own proposed facts and his declaration and exhibits in support of his opposition to the defendant's motion. The court accepts the plaintiff's explanation that he "always" files a "motion in opposition" to a defendant's motion for summary judgment, even though the court's Local Rules do not require him to file this document. As the court

understands it, the plaintiff is responding to the defendant's brief and facts, so he also chooses to respond directly to her motion for summary judgment.

Because the plaintiff's "motion" is not actually a motion but a response to the defendant's motion, the court will deny the defendant's motion to strike as unnecessary and will consider the plaintiff's response to the defendant's motion. The court will order the clerk to change the plaintiff's "motion" to a response to the defendant's motion for summary judgment. Because the plaintiff's response is not a motion, the court will take no other action on it.

C.    Factual Background

1.    *The Plaintiff's Complaint*

The plaintiff filed his complaint on the court's form for incarcerated persons proceeding without an attorney. Dkt. No. 1. The plaintiff signed his complaint and "declare[d] under penalty of perjury that" its contents are "true and correct." Id. at 6. The court treats the verified complaint as "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)).

The court detailed the complaint's allegations in the screening order:

> The complaint alleges that on December 21, 2020, while the plaintiff was in restricted housing at Waupun, officers "chemically sprayed" Donald Alford, who was in the cell next to the plaintiff. The plaintiff pressed his emergency call button and told Officer Mason . . . that he needed his nebulizer treatment and to notify the nurse that he couldn't breathe; Mason said "ok." The plaintiff also told the range officer, Ms. Grosskoph . . . that he couldn't breathe and to notify a nurse; Grosskoph said okay and walked off. [The defendant]

came to the restricted housing range with Officer Hollelefelder . . . .
The plaintiff says the food trap of his cell was open to assess him
because he had just returned from court and was on quarantine, so
his pulse was taken. The plaintiff told [the defendant] that he could
not breathe because Alford had been chemically sprayed and that
he needed to be pulled out and assessed with a nebulizer treatment.
He alleges that [the defendant] "was aware of [his] asthmatic need's
[and] she [knew his] asthmatic history." He asserts that [the
defendant] said "ok after dinner i will have you pulled out." The
plaintiff alleges that Hollelefelder's body camera recorded this. The
plaintiff alleges that after "dinner hours pass &" he was not pulled
out, assessed or given a nebulizer treatment . . . .

  The plaintiff says that around bedtime during evening
medication pass he saw [the defendant] "walking fast with a[n]
asthmatic inhaler in her hand." He tried to stop her to ask why he
had not been pulled out to be assessed and given nebulizer
treatment, but that she ignored him. The plaintiff says that when
[the defendant] walked back, he again attempted to stop her; he
noticed that there was no inhaler in her hand, and she continued to
ignore him and walked off the range. Grosskoph stopped at the
plaintiff's cell to distribute his medication. The plaintiff again asked
why [the defendant] had not provided him nebulizer treatment. The
plaintiff says,

   Officer Grosskoph said well, she gave me this to
give to you, & held up the same exact inhaler i had on
my person's, when i saw her walk pass me, i showed
Officer Grosshoph the same inhaler that i had in my
possession, she just shook her head & said she dont
know.

Id. at 3–5 (internal citations omitted).

  The plaintiff now says he "may have made a harmless error in putting

December 21, 2020, instead of [D]ecember 23, 2020" as the date of the incident

in question. Dkt. No. 62 at 3. He concedes that no incarcerated persons "were

chemically sprayed on December 21, 2020 in 'RHU.'" Dkt. No. 60 at 9. The

defendant emphasizes that the plaintiff "now acknowledges that the correct

date of the relevant interaction was December 23, 2020." Dkt. No. 50 at 2, n.1.

The defendant nonetheless discusses her interactions with the plaintiff on both dates because she "saw him on both December 21 and December 23, 2020." Id.

### 2. *Defendant's Proposed Facts*

The plaintiff was incarcerated at Waupun during the events described in the complaint. Dkt. No. 51 at ¶1. The defendant is a licensed, registered nurse and was a Nurse Clinician II working in the Health Services Unit (HSU) at Waupun from May 2, 2016 through August 16, 2021. Id. at ¶2. The defendant avers that, as a Nurse Clinician II, her responsibilities include assessing and treating patients, assisting physicians in providing medical services, managing medications, providing emergency care and maintaining medical records. Dkt. No. 52 at ¶4. She regularly conducted examinations of incarcerated persons in the HSU or the Restricted Housing Unit (RHU), as needed. Id.

On December 14, 2020, the plaintiff was placed in quarantine at Waupun under the prison's COVID-19 protocols at the time because he had returned from four days at Brown County Jail and was "reporting symptoms." Dkt. No. 51 at ¶5; Dkt. No. 53-1 at 8.

### a. December 21, 2020

On December 21, 2020, the defendant worked in the RHU at Waupun from 7:30 a.m. to 9:15 p.m. Dkt. No. 51 at ¶7. The defendant avers that she is not aware of any incarcerated person being chemically sprayed that day. Dkt. No. 52 at ¶10. But she notes that "[s]ecurity does not always tell [her] if a person was sprayed with Oleoresin Capsicum (OC), unless they need [her] to

assess that person." Id. The plaintiff's medical records[2] show that on December 21, 2020, the defendant saw him at 4:07 p.m. for a COVID-19 screening. Dkt. No. 53-1 at 5–6. The plaintiff did not report any COVID-19 symptoms, such as chills, cough, shortness of breath or loss of taste or smell. Id. The defendant did not see the plaintiff again on December 21, 2020. Dkt. No. 51 at ¶10.

### b. December 23, 2020

On December 23, 2020, the defendant worked at Waupun from 7:30 a.m. to 9:45 p.m. Id. at ¶11. She says that she reviewed Officer Hollfelder's body worn camera (BWC) video from 3:03 p.m. to 3:20 p.m. because he was with her on December 23, 2020 when she stopped at the plaintiff's cell. Id. at ¶14 (citing Dkt. No. 53-2).

According to the defendant's review of the video from Officer Hollfelder's BWC, she stopped at the plaintiff's cell, and the plaintiff told her that someone had just been chemically sprayed and asked for nebulizer treatment. Id. at ¶15 (citing Dkt. No. 53-2 at 00:04-00:06). The defendant avers that she is not aware of any incident involving staff using chemical spray on an incarcerated person in the RHU on December 23, 2020. Id. at ¶16. The defendant asked the plaintiff if he had his inhaler in his cell. Id. at ¶17 (citing Dkt. No. 53-2 at 00:35-00:48). The plaintiff responded that he did, and that "he had taken 6 or 7 inhaler pumps and it was not working." Id. The defendant "told him that was

---

[2] The defendant filed with the plaintiff's medical records a "Certification of Records," which is signed by Waupun's records custodian. Dkt. No. 53-1 at 1. She also filed a declaration from James Muenchow, who avers that the plaintiff's medical records submitted as Exhibit 1000 are a "true and correct copy" of those records. Dkt. No. 53.

a lot of albuterol." Id. The plaintiff asked the defendant if she would pull him out after he ate, but she responded that she "would check on him after he ate to see how he was doing as sometimes eating and drinking will clear any irritant from his throat." Id. at ¶18 (citing Dkt. No. 53-2 at 01:03–01:16, 02:12–02:18). The defendant told the plaintiff that, to her knowledge, security had not chemically sprayed anyone in the RHU, where the plaintiff was located. Id. at ¶19 (citing Dkt. No. 53-2 at 01:17–01:29). The plaintiff told her that an incarcerated person was sprayed on a lower floor of the prison, and the chemical spray came up through the vent. Id.

The defendant avers that she did not tell the plaintiff that she would check on him because of his asthma or that she would have him pulled out of his cell. Id. at ¶20. She asserts that the plaintiff never told her that he was experiencing tightness in his chest or difficulty breathing. Id. at ¶21. She avers that "many nonverbal signs can be noted as part of an assessment, even one from an inmate's cell front like the one [she] had with" the plaintiff on December 23, 2020. Id. at ¶22. She says that when she spoke with the plaintiff on December 23, 2020, he showed no signs or symptoms of difficulty breathing or shortness of breath; he was not wheezing or coughing; he was calm and spoke in complete sentences; and he showed no signs of distress. Id. at ¶¶22–23.

The defendant avers that she saw the plaintiff a second time on December 23, 2020, at around 5:00 p.m. for a COVID-19 assessment. Id. at ¶24; Dkt. No. 53-1 at 2–3, 9. The plaintiff's medical records of this visit show

he was not experiencing coughing, shortness of breath or other COVID-19 symptoms. Dkt. No. 53-1 at 3. The defendant recorded that the plaintiff was "Alert," his heart rate was "Regular" and his breathing was "Regular" and "Unlabored, Quiet." Id. He responded to her "with sentences, phrases, words." Id. The defendant avers that based on her assessment of the plaintiff, she had no reason to believe that the plaintiff needed additional medical care, such as nebulizer treatment. Dkt. No. 52 at ¶24.

The defendant avers that she knew on December 23, 2020 that the plaintiff suffers from asthma. Dkt. No. 52 at ¶25. She explains that asthma symptoms vary from person to person and may include "shortness of breath, chest tightness, pain, wheezing or coughing." Id. at ¶26. The defendant says that she has had nursing visits with several asthmatic persons at Waupun, including the plaintiff. Id. at ¶27. She says that if a person is experiencing trouble breathing or tightness in his chest, it could be evidence of asthma symptoms or of an asthma attack. Id. at ¶28. If an incarcerated person tells the defendant that he is having trouble breathing or has tightness in his chest, she assesses the person visually for signs of medical distress and might check his airway, breathing and pulse. Id. at ¶¶29–30. She asks if the person has an inhaler, and if so, she may help the person use it. Id. She reiterates that the plaintiff did not report having tightness in his chest or difficulty breathing to her on December 21 or 23, 2020, and he did not display any signs of medical distress. Id. at ¶¶28–30.

The defendant avers that the plaintiff had an albuterol inhaler in his cell to use as needed on December 21 and 23, 2020. Id. at ¶31. She says the inhaler "is usually the first line of defense for shortness of breath," and she considers a nebulizer treatment only if the inhaler is ineffective. Id. The defendant avers that she has provided the plaintiff nebulizer treatments in the past and is "familiar with the process of doing so." Id. at ¶32. She explains that "there are a couple of ways a nebulizer treatment can be done," if she determines that treatment is necessary. Id. at ¶33. The incarcerated person can be brought down to the RHU exam room or to a holding cell for nebulizer treatment. Id. She says that because the plaintiff has a "history [of] staff assaults and his refusal to give his nebulizer back to staff, nebulizer treatments had to be given to him with extreme caution." Id. at ¶34. This usually involved security staff bringing the nebulizer machine and an extension cord to the plaintiff's cell, feeding the mouthpiece of the machine through the plaintiff's cell door and monitoring his behavior during the treatment. Id. The defendant also recounts that she has removed the plaintiff from his cell for medical care in the past, but that he "require[s] 3 officers to secure and remove him from his cell." Id. at ¶¶35–36. The defendant avers that because of the plaintiff's "manipulative" and "disrupti[ve]" behavior, she had to "assess each of his claims and only remove him from his cell when it was indeed medically necessary." Id. at ¶36. She avers that because the plaintiff was not in distress on December 21 or 23, 2020, he did not need to be removed from his cell for nebulizer treatment on those days. Id. at ¶37.

### 3. Video Exhibit

The defendant filed a video exhibit of footage taken from Officer Hollfelder's BWC in the afternoon on December 23, 2020. Dkt. No. 53-2 (Exhibit 1001). This is the video to which the defendant refers and to which she cites throughout her proposed findings of fact and her declaration.

The video begins showing a nurse (the defendant) pushing a blue medical cart down a hall. The defendant and the officer stop at cell A227, and a voice (the plaintiff) can be heard asking, "Can you pull me out to get [an] assessment again?" Id. at 0:01–0:02. The defendant asks, "For what?", and the plaintiff says, "Somebody just got sprayed and everything, and I need to use my nebulizer, if possible." Id. at 0:02–0:06. His voice is calm and clear, and he is not coughing, gasping or wheezing. The defendant says, "You don't have a current order for that, but if you need one, we can do it." Id. at 0:07–0:12. The officer says something to the defendant before unlocking the trap of the plaintiff's cell door. Id. at 0:12–0:19. The plaintiff begins coughing, and the defendant says, "Aww, you just started coughing when I got over here." Id. at 0:20–0:22. The plaintiff insists he had "been coughing" before the defendant arrived, and the defendant says, "I know, I'm just—I just didn't hear you coughing when you were calling me." Id. at 0:22–0:27. The plaintiff reaches his right hand out of his trap door, and the defendant places a device on his right index finger. Id. at 0:25–0:28. The plaintiff asks if his eyes are red, and the defendant tells him, "No, actually, they're not." Id. at 0:27–0:29.

14

The plaintiff asks if the defendant will pull him "out for an assessment because I'm having difficulty breathing." Id. at 0:30–0:34. The defendant asks if the plaintiff has an order for an inhaler, and the plaintiff says he has an inhaler in his cell that isn't working that he tried using "like six, seven times." Id. at 0:34–0:41. The defendant responds, "Six or seven times? That's a lot of albuterol. We don't want to give you a [inaudible] albuterol. Your heart rate will go through the roof." Id. at 0:42–0:50. The defendant uses a thermal forehead thermometer to take the plaintiff's temperature, which she notes is 98.2 degrees. Id. at 0:43–0:52. She steps away to record his temperature and to allow the device on the plaintiff's finger "to read." Id. at 0:52–1:03. At 0:59, the plaintiff coughs once.

The plaintiff asks the defendant, "Hey, you think you could pull me out after we eat?" Id. at 1:04–1:07. The defendant responds, "Well, let's—how about I'll check back with you after you eat and see how you're doing?" Id. at 1:07–1:09. She explains (as she noted in her declaration) that OC spray is an irritant, and food or beverage might clear the plaintiff's throat. Id. at 1:09–1:16. The defendant says, "They didn't spray up here," and the plaintiff says an incarcerated person was sprayed "downstairs, and that [the spray] came through the vent." Id. at 1:18–1:25. He says he pressed his button, so the officers in "the bubble" would know about the spray coming up through the vent. Id. at 1:30–1:32. The defendant tells the plaintiff that officers are about to pass out meal trays, so she will "come back and check with [him] after [his] meal, OK? See how [he is] doing?" Id. at 1:35–1:39. She observes that the

device on his finger "never reads," which she speculates might be because the plaintiff has "fingers that are cold or something." Id. at 1:39–1:46. She removes it from his index finger and tries to get a reading on his other fingers of his outstretched right hand. Id. at 1:43–1:56. The plaintiff reaches out his left hand for the defendant to try a different finger, saying, "Try these fingers, they might be warmer." Id. at 1:55–1:57. At 2:07, the plaintiff clears his throat.

At 2:13, the defendant says, "Alright" and removes the device from the plaintiff's finger. She again says that officers will "be here with trays in a minute." Id. at 2:13–2:14. She tells the plaintiff to "go ahead and eat and keep drinking fluids," and she will check back in with him. Id. at 2:14–2:17. The plaintiff responds, "Okay." Id. at 2:17. The officer closes and locks the plaintiff's trap door. Id. at 2:20. The video ends as the defendant and the officer continue pushing the medical cart down the hall.

Throughout the video, the plaintiff is not coughing except for the few coughs that the defendant comments on. The plaintiff does not wheeze, gag or gasp for air. He does not struggle to breathe or talk, and his voice is clear and calm. He speaks in full sentences without apparent difficulty or urgency.

4.    *The Plaintiff's Materials*

a.    The Plaintiff's Exhibits

The plaintiff attached 164 pages of exhibits to his response materials. Dkt. No. 60-1. These exhibits are not in any discernible order, and they are not consistently labeled. Some exhibits are labeled with numbers, others are labeled with letters. Some exhibits are not inherently relevant, such as an

institutional complaint report for a complaint the plaintiff filed in June 2022. Id. at 23–29. The court reviews only the exhibits that the plaintiff cited in his response materials. See Fed. R. Civ. P. 56(c)(3).

b.    The Plaintiff's Declaration

The plaintiff's declaration largely recounts the defendant's declaration, then points out inconsistencies between that document and the defendant's responses to the plaintiff's request for admissions during discovery. Dkt. No. 61 at 1–3. The plaintiff says that these discrepancies show that "[the defendant] lied under perjury." Id. at 2. He repeats this assertion throughout his declaration and other response materials. He also disputes many of the defendant's statements in her declaration related to his visits on December 23, 2020. He cites his "recollection" of events from the first visit to dispute the defendant's statements about their conversation. Dkt. No. 62 at 9–11. He again claims the defendant "lied under perjury" in her admissions about December 23, 2020, id. at 8, and that the "HSU has a history at Waupun [of] fabricating, lying, omitting, down playing inmates medical records." Id. at 11. He cites his proposed facts in support of these disputes.

The plaintiff says that he "do[es] recall telling [the defendant] [he] was having tightness in [his] chest and trouble breathing. Rather it was before or after Officer [H]ollfelder body camera was on." Dkt. No. 61 at ¶12. The plaintiff contests the defendant's statement that he is manipulative or disruptive. Id. at ¶14. He discusses in detail each of the conduct reports he has received since being at Waupun and acknowledges that he was found guilty of assaulting an

employee and disobeying orders. Id. He also contests the defendant's statement that he has abused his nebulizer in the past and says that he has "only received 8 conduct reports with [*sic*] dealing with [his] nebulizer" at Waupun. Id. at ¶16. He then details each of those eight conduct reports.[3] Id. at ¶¶17–24.

Relevant to December 23, 2020, the plaintiff avers that "[the defendant] did not conduct a full asthmatic assessment" that day because he was on quarantine after his return from Brown County. Id. at ¶25. He says the defendant "was suppose[d] to do a peak flo, listen to lungs," but she did not do those things. Id. at ¶26. The plaintiff avers that a nebulizer "has been proven to be ea[si]er to use and more effective," and he says the nebulizer is more effective for him than an inhaler. Id. at ¶28. The plaintiff documents his family history of asthma. Id. at ¶¶29–31. The plaintiff avers that he underwent a "pulmonary breathing test" at Waupun, which showed that he has "asthma between moderate to severe." Id. at ¶¶32–33.

---

[3] The court is aware of the plaintiff's asthma and his occasional need for nebulizer treatment because he has filed several lawsuits about Waupun staff denying him nebulizer treatment. See, *e.g.*, Case No. 20-cv-1889-pp, Dkt. No. 50 at 5; Case No. 20-cv-1890, Dkt. No. 103 at 1–11. The court also is aware of the restrictions Waupun has placed on the plaintiff for nebulizer treatment because of his assaulting staff and refusing to return his nebulizer after using it. See, *e.g.*, Case No. 20-cv-1889-pp, Dkt. No. 50 at 5–7; Case No. 20-cv-1890, Dkt. No. 103 at 10. The plaintiff contests the defendant's description of his previous conduct reports and history of being violent and disruptive, but he does not explain what relevance his reputation has to his claims in this case about whether the defendant was deliberately indifferent to his medical needs on December 23, 2020. Nonetheless, the plaintiff's lengthy description of his conduct reports (both for assaulting staff and for misuse of his nebulizer) support the defendant's statements that Waupun staff must use caution when treating the plaintiff or deciding whether to take him out of his cell to provide nebulizer treatment.

The plaintiff again avers that the HSU at Waupun "has a history of lying, omitting certain details, facts from [his] medical records, such as [him] telling them about pain—tightness in [his] chest." Id. at ¶35. He says the HSU also has a history of "fabricating [his] medical notes, of something [he] said, did, or was doing." Id. The only evidence the plaintiff cites in support of this statement is a declaration from another incarcerated person, Kurtis Jones. Id. (citing Dkt. No. 60-1 at 34). Jones avers that the HSU has a "practice of minimizing injuries" and that he has experienced "several instances where a nurse has fabricated something [he has] said." Dkt. No. 60-1 at 34.

The plaintiff reiterates that the correct date of the alleged incident is December 23, 2020. Id. at ¶36. He says that "[he] may have or this court may have made a harmless error by by [*sic*] stating December 21, 2020 unstead [*sic*] of putting December 23, 2020." Id. He says he cannot find a copy of his complaint to confirm the date he used. Id. The plaintiff reiterates the allegations of his complaint, but says that he used the date of December 23, 2020 in his complaint. Dkt. No. 61 at ¶¶44–48. (The complaint references both dates— December 21 and 23, 2020. See Dkt. No. 1 at 2, 6.)

The plaintiff spends several paragraphs explaining the process for exhausting administrative remedies, much of which appears to be taken verbatim from the court's previous order denying the defendant's motion for summary judgment on exhaustion grounds. Dkt. No. 61 at ¶¶37–43; see Dkt.

19

No. 32. He also appears to contest the results of his institutional complaint about this issue. Dkt. No. 61 at ¶¶46–47.[4]

The plaintiff says he wrote to the records office at Waupun to request the video footage from the evening of December 23, 2020, but that he incorrectly asked for the "hallway camera for 12-18-20." Id. at ¶49. He says he did not realize until discovery had concluded that he used the wrong date on his request, and he did not receive video footage from the evening of December 23, 2020. Id. at ¶50. He says this footage "would've shown [the defendant] walking pass [sic] and then around [his] cell giving Officer Grosscough [sic] an identical inhaler [he] already held on [his] person's [sic] and leaving A range on the opposite side." Id. Neither party submitted a video exhibit of this alleged second encounter on December 23, 2020.

The plaintiff avers that "chemical spray" cannot be used on him "due to [his] asthma." Id. at ¶51. He says his electronic medical record shows this. Id. He says that when staff perform "cell extraction's on [him], they never used chemical spray on [him], but will have a taser, paintball gun or electric shield." Id. The plaintiff does not explain the relevance of this statement and does not assert that staff used chemical spray on him on December 23, 2020.

The plaintiff says that on September 18 and 25, 2022, he wrote to the HSU and pharmacy at Waupun about an inhaler that he believed was "not stored at room temperature as directed on the inhaler box." Id. at ¶52. He says

---

[4] As the court has explained, it denied the defendant's motion for summary judgment on exhaustion grounds. These paragraphs of the plaintiff's declaration are not relevant to the merits of the claims in this lawsuit.

he inquired whether the inhaler was "still effective or not[,] due to the wheather [*sic*]." Id. He says that HSU Manager Weinman responded, "We are not educated or trained to give a response, you may write Pharmacy and we can forward." Id. He cites exhibits he attached to his response materials, which include two letters he wrote to the pharmacy and the response he received to a Health Service Request dated September 18, 2022. Dkt. No. 60-1 at 3–5. The plaintiff asserts that because the HSU is not "educated or trained to answer the inhaler storage questions[,] neither is HSU trained or educated on chemical spray used on a [*sic*] inmate closed by [*sic*] and the inhaler being effective or noneffective due to the temperature of where the inhaler is stored at in a [*sic*] inmate cell." Dkt. No. 61 at ¶53. The plaintiff says his inhaler is often ineffective when it is "hot-humid-muggy in 'RHU' in the summer time" or when it is "cold in 'RHU' during the winter time." Id. at ¶¶54–55.

The plaintiff says that "when inmates get chemically sprayed in 'RHU' [his] inhaler is none [*sic*] effective." Id. at ¶58. He cites a declaration from fellow incarcerated person Shawn Eubanks, Jr. Id. (citing Dkt. No. 60-1 at 32–33). Eubanks says that on July 4, 2022, an incarcerated person was sprayed "with a pepperball gun," which "sent strong, harsh breathing irritants into the air." Dkt. No. 60-1 at 32. He says that he heard the plaintiff yell that he could not breathe, and "Nurse Jessica" responded to the plaintiff but did not provide him nebulizer treatment. Id. at 32–33. Eubanks asserts that "RN Jessica" has repeatedly denied medical treatment for incarcerated persons who had

breathing difficulties after another person was sprayed with chemical agents. Id. at 33.[5]

The plaintiff ends his declaration by again providing his version of the events from December 23, 2020. He says that the defendant assessed him that day for COVID-19 because he "was on quarantine." Dkt. No. 61 at ¶59. He says she "only took [his] temperature despite [the defendant] falsifying [his] medical records by saying she listen to [his] lungs, when she didn[']t." Id. at ¶60. The plaintiff says he does not know whether Officer Hollfelder's "body camera was on prior to [him] coughing." Id. at ¶61. He says that he asked the defendant if she could "pull [him] out to get assessed and for a nebulizer treatment because" another incarcerated person "got chemically sprayed." Id. at ¶62. He says the defendant "replied their [sic] going be doing [sic] meals—dinner shortly after." Id. at ¶63. The plaintiff reiterates that the defendant did not listen to his lungs and only took his temperature. Id. at ¶64.

The plaintiff avers that no one pulled him out of his cell "but hours later [the defendant] was walking on [his] side with a[n] albuterol inhaler in her hand. Id. at ¶65. He says he "saw [the defendant] leaving on the other side despite [him] calling to her to pull [him] out." Id. at ¶66. The plaintiff avers that "Officer Grosscough [sic] came to [his] cell for medication by which she stated 'Nurse Jen'—Jennifer gave her an albuteral [sic] inhaler despite [him] having one in [his] cell[,] by which [he] told Grosscough [he] already have that." Id. at

_____

[5] It is not clear who "RN Jessica" is or how Eubanks's statement about her is relevant to the plaintiff's claims in *this* lawsuit against *this* defendant.

¶67. The plaintiff says he wrote to "HSU manager Weinman concerning [the defendant] by which Weinman replied saying no report of this." Id. at ¶68. He asserts that this "means [the defendant] lied and reported [he] never told her about a[n] inmate getting chemically sprayed or [him] needing a nebulizer." Id. He cites pages of his exhibits, which are his request for health services from December 23, 2020. Dkt. No. 60-1 at 103–105. The plaintiff's handwriting on these forms is difficult to read, but it appears the plaintiff notes that another incarcerated person "was sprayed with chemical spray" that afternoon. Id. at 103. He mentions "Grosskoph [*sic*] [and] Nurse Jen" and says that he was "not given nebulizer." Id. The response reads, "No report of this noted. Do you wish to be seen now? Can set up appointment." Id.

The plaintiff discusses his institutional complaint about this incident, and he cites the institutional complaint report that he attached to his exhibits. Id. at ¶69 (citing Dkt. No. 60-1 at 7–17). He says that his complaint "was rejected due to [the defendant] lied," and Officers Mason and "Grosscough [*sic*]" did not investigate his complaint. Id. He asserts that "this is not the first time [the defendant] didn[']t pull [him] out due to [him] being on quarantine concerning [his] asthma[,] which she lied—fabricated [his] medical records." Id. at ¶70. He cites a page of his medical records from May 21, 2021, which is a nurse triage report that the defendant wrote about the plaintiff's request "to resume nebulizer treatments." Id. (citing Dkt. No. 60-1 at 127).

The plaintiff avers that on December 23, 2020, he "did inform [the defendant] that [he] was having tightness and pain in [his] chest due to another

inmate being chemically sprayed[,] and had requested a nebulizer." Id. at ¶71.

He cites the BWC video exhibit that the defendant submitted.[6] He says the

defendant "was suppose[d] to conduct a proper assessment for [his] asthma."

Id. at ¶72. He cites a page of DAI (Division of Adult Institutions) policy in

support of this statement, but he does not say where in his exhibits this policy

appears. Id. (citing "ex DOC at 018-021 as D-A-i [sic] policy 500.30.18, nursing

assessment protocols and procedures"). The court was able to locate this

document. Dkt. No. 60-1 at 19–21. This policy generally discusses proper

nursing assessment protocols and procedures, but it was not effective until

January 25, 2021. Id. This policy also says nothing specific to asthma or

conducting an assessment on an incarcerated person suffering asthma

symptoms or an asthma attack.

The plaintiff says that "due to chemical spray that was used on another

inmate on 12-23-20 [he] was coughing, had pain in [his] chest, and difficulty

breathing, sleeping, working out, due to staff at times don[']t immediately turn

the vents off." Dkt. No. 61 at ¶73. He says that "inmates at time when

chemically sprayed refuse to see 'HSU' whereby a nurse working in 'RHU'

wouldn't know if chemical spray were used, unless the chemical spray is heavy

and still in the air." Id. at ¶74. He again cites Eubanks's declaration in support

of these statements, but he does not explain how that declaration is relevant.

Id. (citing Dkt. No. 60-1 at 32–33).

---

[6] As the court documented above, the plaintiff *cannot* be heard saying anything
about being in pain or feeling tightness in his chest on that video.

## II.    Discussion

### A.    Summary Judgment Standard

A party is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Neither argument nor speculation is enough to avoid summary judgment. See Ammerman v. Singleton, 817 F. App'x 265, 268 (7th Cir. 2020) (citing Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)). Instead, the plaintiff, as the non-moving party, "needs to come forward with *evidence*" that would allow a jury to return a verdict in his favor if the case proceeded to trial. See Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012) (emphasis in original).

### B.    Eighth Amendment

The court analyzes a plaintiff's claim that prison staff were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel

and unusual punishments clause. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." <u>Id.</u>

In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. <u>Stewart v. Wexford Health Sources, Inc.</u>, 14 F.4th 757, 763 (7th Cir. 2021) (citing <u>Balsewicz v. Pawlyk</u>, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" <u>Karraker v. Peters</u>, 65 F.3d 170 at *3 (7th Cir. 1995) (citing <u>Davis v. Jones</u>, 936 F.2d 971, 972 (7th Cir. 1991)). But the Supreme Court also has held "that medical conditions far less critical than 'life-threatening' would be encompassed" by the term "serious medical need." <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1370 (7th Cir. 1997). Factors the court must consider in determining whether a plaintiff's medical need is sufficiently serious is whether his condition has been diagnosed by a physician as needing treatment, <u>id.</u> at 1373 (citing <u>Laaman v. Helgemoe</u>, 437 F. Supp. 269, 311 (D.N.H. 1977)); whether failure to treat the condition could result in further serious injury or unnecessary and wanton infliction of pain, <u>id.</u> (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th

Cir. 1992)); and whether the condition significantly affects the plaintiff's daily activities, id. (quoting McGuckin, 974 F.2d at 1059-1060).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

In the context of a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–

95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

C.    Analysis

The parties agree that the relevant events for purposes of this lawsuit occurred on December 23, 2020, not December 21, 2020. The complaint uses both dates (Dkt. No. 1 at 2, 4), but the plaintiff repeatedly says that either he or the court made "a harmless error" and wrote that the events occurred on December 21, 2020. The court did not make an error; in the first paragraph on page 2, under "Statement of Claim," the plaintiff wrote, "2. On 12-21-20 while I Timothy Durley . . . was residing in RHU cell A227, inmate Donald Alford . . . was chemically sprayed on the above date, who was also located in RHU A lower." Dkt. No. 1 at 2. The plaintiff wrote the incorrect date when drafting his complaint, but the court understands that the relevant date is December 23, 2020. With that understanding, the court will review the parties' evidence regarding only the events of December 23, 2020.

1.    *Objectively Serious Medical Need*

The defendant asserts that she is entitled to judgment as a matter of law because the plaintiff was not suffering from a serious medical need on December 23, 2020. Dkt. No. 50 at 11. She cites cases from the Seventh Circuit Court of Appeals, which has held that asthma "can be a serious medical condition" depending on its degree and severity. Id. (quoting Garvin v. Armstrong, 236 F.3d

896, 898 (7th Cir. 2001); and citing <u>Lee v. Young</u>, 533 F.3d 505, 510 (7th Cir. 2008)).

The defendant asserts that the Seventh Circuit requires "more than the plaintiff alleging that he had trouble breathing or that he needed treatment" to find that he suffered from an objectively serious medical condition. <u>Id.</u> She discusses several Seventh Circuit cases holding that a plaintiff's allegations of "difficulty breathing, chest pains, dizziness, drowsiness, sinus problems, burning sensations in his throat, and headaches"; "breathing problems . . . shortness of breath and headaches"; "that he had asthma, needed his inhaler, and couldn't breathe"; or "wheezing, coughing, shallow breathing, nausea, light-headedness, and an inability to complete sentences" failed to satisfy the objective component of an Eighth Amendment claim. <u>Id.</u> at 11–12 (citing and quoting cases).

The defendant asserts that "[t]his case represents a very similar fact pattern as present in those aforementioned cases." <u>Id.</u> at 13. She summarizes the plaintiff's claim as alleging "that he was not able to breathe" because of the chemical spray prison staff had used on another incarcerated person. <u>Id.</u> But the defendant observes that, as the BWC video shows, the plaintiff "did not report that he could not breathe, nor did he report any tightness in his chest," and the defendant determined that he did not require immediate medical attention. <u>Id.</u> The defendant recounts that she saw the plaintiff later that evening and that again he "showed no signs or symptoms of medical distress." <u>Id.</u> The defendant concludes that because the plaintiff "was not displaying any signs

that he was suffering a serious asthma attack that would require immediate medical attention, he was not suffering from a serious medical need." Id. She contends that she is entitled to summary judgment on this basis alone. Id.

The plaintiff responds that he has "been diagnosed with moderate to severe asthma," and he cites pages from his exhibits in support of that statement. Dkt. No. 60 at 16; Dkt. No. 60-1 at 40–45. Those exhibits include medical records from February 16, 2023–-more than two years *after* the events that gave rise to this case. Dkt. No. 60-1 at 40. One page of those records says that the plaintiff has "[m]oderate persistent asthma," not severe asthma. Id. The nurse practitioner he saw prescribed an albuterol inhaler, not a nebulizer. Id. at 43. That nurse practitioner recommended that the plaintiff use "albuterol inhaler with spacer OR albuterol nebulized solution" at the first sign of asthma symptoms and if his symptoms worsen. Id. at 44–45. Neither these exhibits nor any others that the plaintiff submitted say that his asthma is severe or "moderate to severe" or that it was severe in December 2020.

The plaintiff also emphasizes his history of asthma, past triggers of his asthma and treatments for it, which he also discussed in his declaration. Id. at 16–17. He asserts that "[a]sthma can be and frequently is a serious medical condition, depending on the severity of attacks." Id. at 17 (citing Board v. Farnham, 394 F.3d 469, 484 (7th Cir. 2005)). He cites other cases in support of this general proposition, id. at 17–18, and he reiterates that his "asthma is so severe that he even takes season allergies, such as 2 nasal spray, generic verison [*sic*] of Claritan [*sic*] for even a sneeze can trigger the Plaintiff asthma."

Id. at 18. He cites no evidence supporting that statement. The plaintiff says nothing specific about the severity of his asthma on December 23, 2020.

Asthma *can be* considered a serious medical condition, depending on its severity, frequency and other factors. The evidence in this case shows that the plaintiff was diagnosed with asthma before December 23, 2020. See Dkt. No. 53-1 at 4 (providing May 12, 2018, diagnosis date for plaintiff's asthma). The plaintiff asserts that his asthma is moderate to severe, but he has provided no evidence in support of that statement. The defendant does not opine on the severity of the plaintiff's asthma, but she says that his symptoms on December 23, 2020 were not severe. The video evidence confirms that fact. The BWC video shows the plaintiff speaking in slow, calm and complete sentences. Although he tells the defendant that he is having difficulty breathing, the video does not show him struggling to breathe or complaining about tightness in his chest during their conversation. The defendant notes that the plaintiff's eyes are not red.

The record evidence closely resembles some of the cases the defendant cited. For example, in Williams v. Rodriguez, 509 F.3d 392, 402 (7th Cir. 2007), the plaintiff claimed that an officer was deliberately indifferent to his severe asthma when the officer was processing the plaintiff into a jail after his arrest. The Seventh Circuit noted that the plaintiff told the officer "that he had asthma, 'needed [his] medication,' and 'can't breathe.'" Id. But he made those comments in the context of the officer telling the plaintiff to take a breathalyzer test. Id. The court observed that the plaintiff did not again request his inhaler or medical attention, and that he was able "to control his breathing without immediate

medical assistance" during the remainder of processing. Id. The plaintiff had provided no evidence that he "was exhibiting physical symptoms reflective of an asthma attack." Id. The court concluded that the plaintiff had failed "to show that his asthma was sufficiently severe during processing to be considered objectively serious for purposes of his deliberate indifference claim." Id.

Another example is Bates v. Sullivan, 6 F. App'x 425, 428 (7th Cir. 2001), in which the plaintiff (an incarcerated person) claimed that he "was suffering a serious asthmatic attack when [a guard] allegedly refused to give him an inhaler." The plaintiff alleged "only that he was suffering breathing problems when he requested his inhaler and that he suffered shortness of breath and headaches from the incident." Id. The Seventh Circuit concluded that those alleged symptoms "[were] not serious enough to implicate the Eighth Amendment" Id. The court also cited Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999), in which it concluded that "breathing problems, chest pains, dizziness, sinus problems, headaches are 'not sufficiently serious to be constitutionally actionable.'" Id. (quoting Henderson).

The plaintiff's complaint alleges that he told an officer that he could not breathe and needed nebulizer treatment. He alleged that he reiterated to the defendant that he could not breathe, and she agreed to have him pulled out for nebulizer treatment after dinner. The undisputed video evidence shows that this is not what happened. The plaintiff did not tell the defendant that he could not breathe; he told her only that he was having difficulty breathing, and even then, he did not display physical symptoms suggesting that he was struggling to

breathe. He calmly spoke to the defendant in full sentences. He was not wheezing, gasping for air, struggling to control his breathing or showing any signs of medical distress. There is no evidence to suggest the plaintiff was suffering from a severe asthma attack when the defendant spoke with him in the afternoon on December 23, 2020.

The plaintiff alleges that the defendant did not return to his cell later that evening and have him pulled out and provided nebulizer treatment. But he does not allege that he *needed* nebulizer treatment that evening. The complaint does not allege that the plaintiff was experiencing tightness in his chest, difficulty breathing or any other symptoms of asthma during the evening of December 23, 2020. His complaint alleges only that he saw the defendant walking, "attempted to stop her [and] ask why [he] wasn't pulled out to be assess[ed]—given a nebulizer treatment but she ignored [him]." Dkt. No. 1 at 3. He says the defendant ignored him again moments later, and an officer then gave him the inhaler that the plaintiff had seen the defendant carrying. Id. at 3–4. The plaintiff does not say that he was struggling to breathe, feeling tightness in his chest or experiencing any symptoms of asthma or an asthma attack at this time.

The plaintiff's declaration reiterates the allegations of the complaint and provides no additional facts to suggest that his symptoms changed or worsened in the evening on December 23, 2020. He does not assert that he was experiencing asthma symptoms that evening or that the chemical spray from a lower floor was still affecting him. He does not say whether he told the officer who gave him the inhaler (Grosskoph) that he was struggling to breathe or

needed nebulizer treatment. He does not even say that he told (or tried to tell) the defendant that he needed nebulizer treatment. His says only that the defendant ignored him and did not check up on him again as she said she would earlier that day. There is no evidence—not in the complaint, the plaintiff's declaration or his attached exhibits—suggesting that the plaintiff *needed* the defendant to check on him again, or that his asthma had worsened since the afternoon; the defendant had assessed him in the afternoon and had determined that he did not need nebulizer treatment.

The undisputed evidence, including the BWC video of the interaction between the defendant and the plaintiff in the afternoon of December 23, 2020, does not support a finding that the plaintiff was suffering from severe asthma symptoms or a severe asthma attack in the afternoon or evening on December 23, 2020. No reasonable juror viewing this evidence could conclude that the plaintiff was suffering from an objectively serious medical issue that day. The defendant is entitled to judgment as a matter of law on this basis alone.

2. *Deliberate Indifference*

The defendant asserts that even if the plaintiff's asthma on December 23, 2020 could be considered an objectively serious medical need, she "made a reasonable medical judgment when assessing [the plaintiff's] need for a nebulizer treatment" and was not deliberately indifferent to that need. Dkt. No. 50 at 13. The court agrees and finds that the plaintiff's claim also fails on the subjective element.

a. First Interaction on December 23, 2020

The undisputed evidence, including the BWC video,[7] shows that the defendant first saw the plaintiff at his cell around 3:00 p.m. on December 23, 2020. As she approached the plaintiff's cell, he called out to her to ask if she would pull him out to perform an asthma assessment. The court already has explained that the plaintiff's voice is not strained, and he is not coughing or struggling to speak or breathe. Contrary to the defendant's declaration, the plaintiff *does* tell her that he is having difficulty breathing. The court notes that it is difficult to hear the plaintiff say this over the noise in the prison, so it is possible the defendant did not hear the plaintiff say this when she reviewed the video.

The defendant talks to the plaintiff for about two minutes, and he requests that she pull him out to provide him nebulizer treatment. He says that an incarcerated person on another level of the prison was sprayed with a chemical agent, and the fumes are coming through his vent. The plaintiff coughs a few times about thirty seconds into the video. The defendant jokingly suggests he started coughing only because she stopped to talk to him. She tells the plaintiff

_____

[7] As the court ha explained, the video exhibit shows the events in question from the afternoon of December 23, 2020. The plaintiff does not dispute the authenticity of the video, and the defendant based her declaration in part on the video. Because neither party questions the quality or authenticity of the video and its audio, the court will disregard either party's version of the evidence that is inconsistent with what the video exhibit shows. See Scott v. Harris, 550 U.S. 372, 380–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

that his eyes are not red, and his temperature is normal. The plaintiff again requests that the defendant pull him out for an assessment and nebulizer treatment. The defendant notes that the plaintiff does not have a doctor's order for nebulizer treatment. She tells him that she will check up on him again after he has dinner, which staff is about to pass out. The plaintiff agrees, and the defendant leaves his cell. Throughout this interaction, the plaintiff does not cough, wheeze or gasp. He does not struggle to breathe, and he is able to speak in full sentences without any appearance of difficulty. His voice is calm. He does not tell the defendant that he feels tightness in his chest. The plaintiff does not show any overt symptoms of asthma or of an asthma attack.

The court finds that no reasonable juror viewing the video evidence of the interaction between the plaintiff and the defendant on December 23, 2020, could conclude that the defendant was deliberately indifferent to the plaintiff's asthmatic conditions. The defendant avers that she has cared for many asthmatic patients, and that she knows the proper steps to take if an incarcerated person complains of trouble breathing or chest tightness. The defendant avers that when she spoke with the plaintiff during the first interaction on December 23, 2020, he did not show any of the signs or symptoms of asthma that she describes in her declaration; she avers that he did not complain of or show "shortness of breath, chest tightness, pain, wheezing or coughing." Dkt. No. 52 at ¶26. The defendant avers that the plaintiff "was calm and speaking in complete sentences," and he "showed no signs of distress." Id. at ¶23. Contrary to the plaintiff's allegations in the

complaint, the video shows that the defendant did not tell him she would have him pulled out after dinner; she says only that she would come back and check on him again after he ate. Nothing in the video suggests that the plaintiff was showing symptoms of a serious asthma issue that required immediate treatment, such as nebulizer treatment. Nor did the plaintiff's condition suggest that he had trouble breathing or chest tightness that might constitute a serious medical issue or require the defendant to pull him out of his cell for further assessment. Instead, the evidence shows that the plaintiff may have been experiencing some discomfort, and that the defendant assessed him based on his reported symptoms. Again—the video shows that the plaintiff did tell the defendant that he was having difficulty breathing. But the video evidence otherwise confirms the defendant's account, and the plaintiff displays none of the physical symptoms of asthma that either party describes in their declarations.

The plaintiff says he "recall[s]" telling the defendant on December 23, 2020 that he had tightness in his chest and trouble breathing. Dkt. No. 61 at ¶12. He suggests that he told her this before or after the officer's BWC was recording. Id. The video that the defendant submitted begins right as the defendant and the officer reach the plaintiff's cell, and it ends after they have left his cell. There is no evidence to suggest that the defendant had any further interaction with the plaintiff that afternoon. The plaintiff can be heard on the video telling the defendant he is having difficulty breathing, but he is not heard saying that he feels tightness in his chest. Even if the plaintiff did tell the defendant about

these symptoms before or after the video's timeline, the undisputed video evidence shows that the defendant examined the plaintiff and assessed his condition. She found no evidence that the plaintiff was having difficulty breathing despite what he told her, and no reason to believe he was suffering from an asthma attack. Her assessment confirmed that the plaintiff was not in medical distress and did not require nebulizer treatment.

The defendant avers that based on her experience dealing with asthmatic patients, the plaintiff's medical history and his verbal and nonverbal cues during this interaction, she determined that the plaintiff did not need to be pulled out of his cell for further assessment or nebulizer treatment. Even if the defendant's assessment was incorrect (and there is no evidence that it was), her reasoned determination that the plaintiff was not suffering from an objectively serious medical condition does not constitute deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

b.    Second Interaction on December 23, 2020

The plaintiff's medical records show that the defendant visited him a second time on December 23, 2020 at about 5:00 p.m. for a COVID-19 screening follow-up. The defendant's notes from this visit show that the plaintiff displayed no signs or symptoms of asthma, and he denied having symptoms of COVID-19. The plaintiff was alert, his breathing was unlabored and quiet and he responded

with sentences and phrases. His pulse rate was within normal levels, as was his temperature. The defendant told the plaintiff to contact the HSU if symptoms developed, and the plaintiff verbalized his understanding of that instruction. The defendant avers that because the plaintiff was not in distress, she concluded that he did not need to be removed from his cell for an intervention or nebulizer treatment.

The plaintiff insists that this second visit never occurred. He accuses the defendant and Waupun's HSU of lying and fabricating his medical records about this evening visit. The only evidence he cites in support is incarcerated person Kurtis Jones's declaration that the HSU has a "practice of minimizing injuries" and that Jones experienced "several instances where a nurse has fabricated something [he has] said." Dkt. No. 60-1 at 34. Jones says nothing about the plaintiff or the plaintiff's medical records and does not mention the defendant. The plaintiff cites no other evidence in support of his assertion that the HSU fabricated *his* medical records—specifically the record showing the visit with the defendant at around 5:00 p.m. on December 23, 2020. The plaintiff also submitted several pages of his medical records as evidence in support of his claims, despite insisting that his records are fabricated.[8] The plaintiff cannot create a genuine dispute of fact by claiming—without evidentiary support—that his certified medical records are false. See Davis v. Gee, Case No. 14-cv-617-wmc, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (citing Scott, 550 U.S. 372; and Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008)) (explaining

---

[8] See Dkt. No. 60-1 at 35–39, 106–125, 127, 145–148, 153–164.

that allegations that are "based on little more than speculation . . . [are] insufficient to manufacture a genuine issue of fact at summary judgment.").

The plaintiff provides his version of what happened in the evening on December 23, 2020. His declaration reiterates the allegations from his verified complaint, which also is evidence for purposes of this decision. The plaintiff avers that the defendant did not visit him a second time on December 23, 2020. He says she walked by his cell and handed an albuterol inhaler to an officer, who then gave it to the plaintiff. The plaintiff says it was identical to the albuterol inhaler he already had in his cell that he told the defendant earlier that day was not working for him.

But as the court discussed above, neither the plaintiff's complaint nor his declaration say that he was experiencing tightness in his chest, difficulty breathing or other symptoms during the evening on December 23, 2020. The plaintiff does not say that he was struggling to breathe, feeling tightness in his chest or experiencing any symptoms of asthma or an asthma attack at this time. The plaintiff says only that he saw the defendant walking and tried to stop her, but that she ignored him and gave an officer an inhaler to provide to the plaintiff.

The plaintiff may mean to suggest that the same symptoms he was experiencing earlier in the day continued to affect him later that evening, when the defendant allegedly ignored him. But the undisputed evidence shows that earlier in the day, when the defendant stopped and spoke with him, the plaintiff was not demonstrating any signs or symptoms of asthma or an asthma

attack. The BWC video shows the plaintiff speaking and breathing without apparent issue. The defendant avers that she did not believe the plaintiff was in distress, the evidence supports that conclusion and the plaintiff does not provide any evidence to refute it.

Even if the defendant had not checked on the plaintiff a second time, that does not prove that she was deliberately indifferent to his needs. Medical professionals may forget, in the press of the day, comments they make to a specific incarcerated person. The court explained in the screening order that, even if this had happened, it would not constitute deliberate indifference:

> The fact that [the defendant] told the plaintiff she would come back and pull him out for assessment after dinner and then did not does not necessarily show that she *intentionally* refused to treat the plaintiff The facts he alleges could indicate that [the defendant] forgot to come back after dinner, as she'd indicated. If she merely forgot about the plaintiff's request until later, [the defendant] would have been at most negligent in failing to provide the plaintiff treatment, and negligence is not enough to support an Eighth Amendment claim. See Farmer, 511 U.S. at 835–36; Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001).

Dkt. No. 11 at 7–8. But the court noted that there was another possible explanation: "If [the defendant] knew the plaintiff needed nebulizer treatment but provided him only an inhaler like one he already had, one could conclude that she showed deliberate indifference to his medical condition." Id. at 8.

The evidence shows that is not what happened. Even if the plaintiff's version of the events is correct—that the defendant ignored him in the evening on December 23, 2020, and only gave an officer an inhaler to give to the plaintiff—there is no *evidence* to suggest that the situation had changed from a few hours earlier when the defendant assessed the plaintiff and determined

41

that he did not need nebulizer treatment. There is no evidence that by the evening, he was suffering from a serious medical issue and needed nebulizer treatment. Nor is there evidence that, if the plaintiff's condition had changed, he notified the defendant (or anyone) of his changed circumstances and made the defendant aware that he now needed nebulizer treatment. Without any evidence that the plaintiff was suffering from asthma symptoms or an asthma attack in the evening on December 23, 2020, or that the defendant *knew* the plaintiff was suffering those symptoms and needed nebulizer treatment, a reasonable jury could not find that the defendant was subjectively and deliberately indifferent by not stopping to assess the plaintiff a second time or provide him nebulizer treatment. The defendant is entitled to summary judgment on the plaintiff's Eighth Amendment claim against her.[9]

### 3. *The Plaintiff's Other Arguments*

The plaintiff raises several other issues in his declaration. Some concern irrelevant topics or non-existent evidence. The court will briefly address some of the other issues.

The plaintiff repeatedly accuses the defendant of lying in her response to the plaintiff's requests for admissions. He says that she stated in her admissions that she had not viewed the BWC video of the first interaction on December 23,

---

[9] The defendant argued that if the court declined to grant summary judgment in her favor, she was entitled to qualified immunity. "Where a defendant 'wins on the facts, [she] does not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

2020, but that she says in her declaration in support of summary judgment that she has viewed the video. He also points out alleged inconsistencies between her answers in her admissions and her declaration. The defendant's responses to the plaintiff's requests for admission are dated December 29, 2022 (more than two years after the date of the alleged incidents). Dkt. No. 60-1 at 88. The defendant's declaration is dated July 13, 2023. Dkt. No. 52 at 8. The chronology of these documents shows that the defendant *had not* viewed the BWC video of the December 23, 2020 incident when she prepared her responses to the plaintiff's requests for admissions, but that she *had* viewed that video by the time she prepared her declaration in support of summary judgment. It also is possible, even likely, that the defendant did not remember all the details of the December 23, 2020 interaction two years later when she responded to the plaintiff's discovery requests, but that she could recall the events more clearly after viewing the BWC video. The differences in the defendant's statements, made seven months apart, do not suggest that she lied in her discovery responses or her declaration.

The plaintiff also contests the defendant's statement that she was unaware that another incarcerated person had been chemically sprayed. But at the end of his declaration, the plaintiff concedes that "a nurse working in 'RHU' wouldn't know if chemical spray were used, unless the chemical spray is heavy and still in the air." Dkt. No. 61 at ¶74. The BWC video shows the defendant informing the plaintiff that, as far as she knew, no incarcerated person was sprayed on that floor. The plaintiff tells the defendant that it occurred

downstairs, and that the fumes came up through the vent. If the spray was not used on the same floor, as the plaintiff suggests, there is no way to determine whether the defendant could "know if chemical spray were used" on someone on a different floor of the RHU. The plaintiff's declaration corroborates the defendant's statement that she was unaware another incarcerated person had been sprayed and contradicts the plaintiff's earlier statements that the defendant lied about not knowing this.

The plaintiff says he put the wrong date on a request for the hallway camera video from the evening on December 23, 2020; he says he requested hallway camera video from December 18, 2020. He then surmises what the video would have shown and asserts that it would have proven his allegations about the defendant ignoring him. The plaintiff does not have personal knowledge about what would have been on this video had he properly requested that the prison preserve it. His speculation about what it might have shown is not evidence and cannot create a genuine dispute of fact about whether the defendant saw the plaintiff a second time on December 23, 2020. See Cambronero v. Meli, Case No. 22-2103, 2023 WL 4946724, at *2 (7th Cir. Aug. 3, 2023) (citing Pulera v. Sarzant, 966 F.3d 540, 550–51 (7th Cir. 2020)).

The plaintiff spends several paragraphs of his declaration asserting that the HSU is ill-equipped to determine whether an inhaler is effective for a person who is in the vicinity of another incarcerated person who has been chemically sprayed. The plaintiff does not explain the relevance of these assertions to his claims in this lawsuit. The plaintiff does not allege that anyone sprayed him with

a chemical agent on December 23, 2020, and as noted, the video shows him telling the defendant that the spraying happened on another floor. There is no dispute that the plaintiff suffers from asthma and is not supposed to have chemical agents used on him. Nor is there a dispute that the plaintiff believed another incarcerated person had been sprayed on December 23, 2020, and that he could smell the fumes coming through his vent.

The plaintiff asserts that his albuterol inhaler sometimes is ineffective during particularly hot or cold months. It is undisputed that the plaintiff told the defendant that his inhaler was not effective on December 23, 2020. But he does not allege in his complaint or say in his declaration that his inhaler did not work that day because of the cold weather. The plaintiff also is not qualified to give testimony on the kinds of conditions that might cause an albuterol inhaler not to work. He is not a medical professional, he has no medical training and he is not qualified to speak on technical issues about inhalers. See Fed. R. Evid. 701, 702. The plaintiff may have anecdotal experience of an inhaler not working when the conditions were particularly cold, but that statement is not relevant because he does not allege that his cell was cold on December 23, 2020, when it allegedly did not work for him. He says only that "*it can get cold* in [RHU] during the winter time." Dkt. No. 61 at ¶55 (emphasis added). These irrelevant, inadmissible statements do not support the plaintiff's claim against the defendant or create a genuine dispute of material fact.

### III. Motion for Sanctions (Dkt. No. 63)

The court received the plaintiff's motion for sanctions on September 18, 2023, the same day it received his summary judgment response materials. Dkt. No. 63. The plaintiff alleges, as he did throughout his summary judgment materials, that the defendant "lied under perjury" and submitted her declaration in support of her motion for summary judgment in bad faith. Id. at 1.

The plaintiff reiterates that the defendant lied in her declaration where she says that the plaintiff requested nebulizer treatment on December 23, 2020, because in her responses to the plaintiff's requests for admissions, she denied that he requested nebulizer treatment. Id. at 2. He says the defendant falsely denied providing him nebulizer treatment in the past when he "was 'not' in distress" and "that [he] made her aware of what triggers [his] asthma," even though his medical records prior to December 23, 2020 contain his asthma triggers. Id. He again asserts that he "do[es] recall telling [the defendant] on December 23, 2020 [that he] was having tightness—pain in [his] chest, rather it was before or after officer [H]ollfelder body camera was active." Id. He says that "from [his] recollection despite [the defendant] stating she will have [him] pull out after dinner meals, she denied this in her declaration." Id. at 2–3.

The plaintiff says the defendant also lied in her admissions about walking past his cell later, which he says shows she also lied about checking on him in the evening on December 23, 2020. Id. at 3. He reiterates that the defendant fabricated his medical records where she says she listened to his

lungs on December 23, 2020, because "she only took [his] vitals and temperature." Id. He says she lied in her declaration about him being manipulative and disruptive and refusing to return the nebulizer after a treatment. Id. He again insists that he has received only one conduct report for disruptive conduct, and that he was found not guilty of that offense. Id. at 3–4.

The plaintiff asserts that the defendant "provided NO adequate amissible [sic] evidence to prove her alleged outrageous allegations[] concerning [him]." Id. at 4. He says the court should grant his motion and "pa[y] expense's and attorney's fees." Id. He says that he "had to take a day to prepare this motion including all 'conduct reports' he received while [the defendant] worked at Waupun Correctional Institution[,] despite [him] being busy with other case's pertaining to civil suits." Id. at 4–5. He asks the court to pay him "reasonable expense's and for attorney fees as it see's fit." Id. at 5.

The defendant opposes the plaintiff's motion. Dkt. No. 72. She asserts that "none of the conduct that Plaintiff cites to reflects errors which were designed to mislead the Court, hide adverse information, delay resolution of this matter, or materially alter his response to Defendants' [sic] motion for summary judgment." Id. at 1. The defendant notes the inconsistencies between her admissions and declaration and explains that "[the defendant's] recollection at the time she submitted her discovery responses in December 2022 was that [the plaintiff] had not asked her for a nebulizer treatment on that date." Id. She explains that after viewing the BWC video from that day,

"she recognized that plaintiff had asked for a nebulizer treatment and reflected as much in her declaration." Id. at 2.

The defendant asserts that the plaintiff has not shown how her responses in her admissions "materially altered" how the plaintiff presented his case. Id. She notes that she provided the BWC video to the plaintiff in March 2023 and to the court with her summary judgment materials. Id. She says she also provided the plaintiff "an amended response to his first request for admissions which includes [the defendant's] admission that he indeed asked her for a nebulizer treatment." Id. at 2, n.1. She says those materials could not have misled the plaintiff or the court or hidden adverse information. Id. at 2. The defendant says the plaintiff's remaining assertions "boil down to disputes with defendant's proposed findings of fact." Id. She says that the plaintiff's "dispute with [the defendant's] assertions are not grounds for sanctions." Id. at 2–3.

The plaintiff filed his motion under Federal Rule of Civil Procedure 56(h). Under Rule 56(h), if the court is "satisfied that an affidavit or declaration is submitted in bad faith or solely for delay," the court "after notice and a reasonable time to respond . . . may order the submitting party to pay the other party the reasonable expenses . . . it incurred as a result" or otherwise appropriately sanction the submitting party.

The court cannot find that the defendant submitted her declaration in bad faith or for purposes of delay. The court explained above that the defendant's different answers in her admission and declaration are explained

by the passage of time between when she prepared each document. The defendant's response to the plaintiff's motion bolsters that conclusion. The defendant says she had not watched the BWC video of the encounter before she responded to the plaintiff's requests for admissions but had watched that video before preparing her declaration. That explains why her recollection of the events from December 23, 2020 would have been more accurate in her declaration. It is possible, perhaps likely, that she also reviewed the plaintiff's medical records before preparing her declaration, which would have refreshed her recollection about his past requests for nebulizer treatment and his asthma symptoms. The defendant since has amended her admissions to reflect that the plaintiff *did* request nebulizer treatment from her, which is consistent with the undisputed video evidence. The plaintiff is not entitled to sanctions because he remembers the events of December 23, 2020 differently than the defendant. As the court explained above, the BWC video of the events from that day is dispositive, and the court disregarded statements from either party that contradict the undisputed video evidence.

The plaintiff's disputes with the defendant's statements about him being manipulative or disruptive are not "lies" and do not warrant sanctions. Those are statements of opinion from a medical professional who treated the plaintiff on multiple occasions. The defendant is entitled to her opinion about the plaintiff's behavior or temperament, even if the plaintiff disagrees with her characterization.

49

The plaintiff does not request a specific or valid monetary amount. He seeks attorney's fees, but he has no attorney. He requests reasonable expenses but does not explain what expenses he has incurred. He says it took him a day to write this motion, despite his being busy working on his other civil cases. But the plaintiff's motion for sanctions reiterates the allegations of perjury that the plaintiff made repeatedly in his response brief, his response to the defendant's proposed findings of fact, his own proposed facts and his declaration. He needed only copy those allegations into his motion for sanctions. The fact that he spent time working on a meritless motion is not a reason to grant sanctions.

The plaintiff's decision to file multiple civil cases was his. Doubtless it is burdensome for the plaintiff to have several civil cases proceeding at once, but it was the plaintiff's choice to file those cases, and to file them when he did. The court granted the plaintiff's requests for extensions of his deadlines to file his response to the defendants' motions for summary judgment in all his pending cases. In this case, the court extended his deadline from August 16, 2023 to October 31, 2023. Dkt. No. 59. Yet the plaintiff filed his response on September 18, 2023—weeks ahead of the extended deadline. The court gave the plaintiff more time, but it appears that he chose not to use it.

The plaintiff has offered no valid basis for the court to sanction the defendant or to award him expenses. The court will deny the motion for sanctions.

## IV. Conclusion

The court **DENIES AS UNNECESSARY** the defendant's motion to strike. Dkt. No. 71.

The court **DIRECTS** the clerk to change the plaintiff's filing at Dkt. No. 64 from "Motion for Summary Judgment" to "Response to the Defendant's Motion for Summary Judgment."

The court **DENIES** the plaintiff's motion for sanctions. Dkt. No. 63.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 49.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in

federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of December, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**